This is case 1-19-0662 in the matter of O.F., a juvenile. My name is David Ellis. I'm the presiding justice of the 3rd Division. On the panel today is Justice McBride and Justice House. Before we go any further, why don't we ask the attorneys, starting with the attorney for the appellant, to introduce yourselves for the record. Hi. My name is Erin Sostock from the Office of the State Appellant Defender for the appellant O.F. Thank you. And Mr. Erber, you're good now. Hi. Assistant State's Attorney Justin Erb, for the record, I'm representing the people of the state of Illinois. I apologize. My computer is experiencing audio issues. I just now was able to hear what everyone was saying. Okay. Well, so far, Mr. Erb, all we've done is called the case and introduced everyone present, Justice McBride, Justice House, and your opposing counsel, Ms. Sostock? Yes, that's correct. Okay. So, we are doing this oral argument via Zoom. We've done a few of these now, but not many. Anybody who has been on a Zoom conference, I'm sure, is aware that it becomes very difficult to hear when people are talking over each other. So, we have proposed a slightly modified format from how we would normally do it. I'm sure you're accustomed to oral arguments before us, and you know that we typically will pepper you with questions immediately. We are not going to do that today. Here is the format we're going to do. We're going to first have the, obviously, counsel for the appellant will go first. We're going to allow for up to 10 minutes of an uninterrupted presentation. So, you can give your piece, Ms. Sostock, without any interruption from us. We can be flexible. If it's a little over 10 minutes, that's okay, and it's obviously also okay if it's under 10 minutes. At that point, as the presiding justice, I will call on the justices one by one for any questions they would have of the appellant's counsel, starting with the most senior judge, Justice McBride. And we'll do that with each of the justices, and then we will turn to counsel for the appellee, Mr. Erb. Again, a 10-minute presentation. You can go a little over if you need to. You can certainly go under. And then we'll repeat that round of questioning, and then we will have a few minutes reserved. At the end, for Ms. Sostock, we will just go ahead and assume, Ms. Sostock, that you'd like three or four minutes, and we will give you that uninterrupted, followed by questions again. Does everybody understand that? Do either of the attorneys have any questions? No. I understand. No, Your Honor. Okay. All right. Like all oral arguments, this oral argument will be available later by audio only, which is good because I'm not coming in all that well on my video, so there will be no video, but there will be an audio version of this online either later today or tomorrow. We are dealing here with a juvenile, and both parties did an admirable job of hiding the identity of the juvenile in the written submissions. We would ask that you do the same today. You want to refer to him by his initials. You want to refer to him as respondent, defendant, what have you. Let's just realize that this will be public record, so we should protect identities. With that, Ms. Sostock, you have the floor. May it please the Court, Counsel. The State failed to prove O.F. guilty beyond a reasonable doubt because Officer Brian Dorsch's identification of O.F. as the driver of the stolen Jeep was unreliable. Dorsch's only view of the driver was fleeting, was obscured by rainy weather conditions, and was at a time he wasn't even paying attention to the Jeep at all. Given that there was no other evidence to tie O.F. to the stolen Jeep, O.F.'s adjudication for aggravated possession of a stolen motor vehicle should be reversed. Traditionally, courts have looked to the biggest factors when evaluating the reliability of an identification. I'm going to focus my remarks on the first three factors, but I can answer questions on all of them. Here, even looking at these factors in the light most favorable to the State, these factors show that Dorsch's identification of O.F. was unreliable. First, the opportunity to view. Dorsch's view of the driver of the Jeep was fleeting. His only time that he was able to observe the driver was as the car approached the intersection from the opposite direction and then turned in front of him. At that point, he could only see the driver through the passenger side window of the Jeep. Additionally, at the time, it was raining outside, and the rain would have acted as a screen and obscured any view that Dorsch had into the vehicle. Any droplets that accumulated on any of the car's windows, Dorsch's own vehicle, and the Jeep would have impaired his ability to see a clear view of the person's face. Additionally, when it's raining out, cars tend to have windshield wipers and lights on, which are other factors which would have impacted the visibility. Given Dorsch's short time to view the driver, his vantage point from his own car, and the weather conditions, his opportunity to view the driver was unreliable. Regarding Dorsch's degree of attention, his own testimony establishes that this factor was deficient. Dorsch testified that when he viewed the driver of the Jeep, he was not paying attention to the Jeep. Dorsch was on his way to investigate another crime, and he happened to be traveling in the same direction as the Jeep. The Jeep had not committed any traffic offenses. Dorsch testified the Jeep was traveling safely. And given all of this, it is contrary to human experience to believe that Dorsch would be paying close attention to the face of a driver in a car that had no reason to draw his attention. And in fact, it didn't. Additionally, Dorsch was driving his own car at the time, and would have had to pay a certain degree of attention on his own driving abilities. And the fact was, he was about to turn right, whereas the driver of the Jeep was coming from the left. So his attention was probably more focused to the right, where he was about to direct his vehicle, than to the left, studying the faces of the drivers of oncoming traffic. As far as the next factor, accuracy of the prior descriptions, here the state failed to present any physical description of the person driving the Jeep. Despite the fact that identification was a central issue in this case, neither Dorsch nor the two other testifying officers who were called to the scene later testified to any description of the driver of the Jeep. As a result, there is no description of the driver that we can compare to OF's appearance at the time of his arrest. Dorsch's description of the person he saw on foot twice is no more illuminating. Dorsch testified that he saw a person running on foot, and though he never saw that person exit the Jeep, Dorsch testified this person was the driver. His original description of this person gave a description of two items of clothing, a dark hooded sweatshirt, and white or light colored striped dark pants. The second time he saw this person, he was no longer wearing a hoodie. This leaves us only with the striped pants, which does not match OF's description at the time of his arrest. OF's pants had no stripes. They were solid black with a C on the left thigh. Moreover, Dorsch gave no description of the one distinctive item of clothing that OF was wearing, which was bright blue shoes with red laces. Thus, even in the light most favorable state, the accuracy of the prior descriptions, like these prior two factors, weighs against reliability. And then, looking at the totality of the circumstances, there are other facts which weigh against the reliability of Dorsch's identification. First, the method of this identification was in a show-up procedure, which our Illinois Supreme Court has recognized carries a dangerous degree of improper suggestion. Additionally, Dorsch may have seen OF immediately before the show-up when he ran in front of his car. This means Dorsch might have been more likely to identify OF at the time of his arrest because he had just seen him running on the street, not necessarily because he had just seen him as the driver of the car. Additionally, OF was arrested on the block where he lived. This provides a very reasonable explanation as to why OF would be in the area where the stolen Jeep was driving. Looking at the factors to evaluate the reliability of my identification and the totality of the testimony was insufficient to support OF's adjudication. Because no other evidence tied OF to the stolen Jeep, his adjudication should be reversed. I'm going to move on to the second issue. In the alternative, this court should reduce OF's conviction for aggravated possession of a stolen motor vehicle to simple possession. Because the state failed to prove here, beyond a reasonable doubt, an element of the aggravating factor that the officer who signaled for the Jeep to stop displayed red and blue lights. Here, to prove OF guilty of aggravated possession of a stolen motor vehicle, the state had to prove the aggravating factor beyond a reasonable doubt. The aggravating factor in this case was that OF was given a signal to stop by a peace officer but failed to obey. Here, the statute requires that the officer giving the signal shall display the vehicle's illuminated, oscillating, rotating, or flashing red or blue lights. The state failed to prove that OF displayed any red or blue lights. In analyzing a similar statute on fleeing or eluding a peace officer, this court has found that the operative concern is not whether the defendant knew the police were following him, but rather whether the requirements of the statute were met. In Maxie, this court reversed because the unambiguous language of the statute required proof that the police officers were in uniform and the state failed to prove that essential element of the offense. Following a similar analysis here, the state had to prove beyond a reasonable doubt all requirements of the statute, including that the officer displayed red or blue flashing lights. Here, there was no evidence that Dorsch's vehicle displayed red or blue lights. Dorsch testified only that he turned his lights on. There was no testimony that his unmarked car was equipped with red or blue lights. And moreover, there was no testimony that the lights Dorsch turned on were red or blue. The state argues that Dorsch's testimony that he turned on his lights was close enough to infer that these were red or blue. The state's argument essentially reads this element out of the statute. If the legislature did not care what color the lights were, it would not have been so specific in writing that statute. Finally, this case is distinguishable from People v. Brown, where the court held that there was sufficient evidence to show the lights were red or blue. This case is distinguishable because in Brown, there was testimony that the lights turned on were emergency lights, and there was clear evidence that the officer was driving a marked squad vehicle. In this case, the officer did not use the word emergency when indicating that he turned on his lights, nor was the officer driving a marked squad car. Officer Dorsch was driving an unmarked car, and he was not in uniform. Additionally, it's important to remember that the main consideration is whether it can be inferred that the officer turned on red or blue lights, and here there was insufficient evidence to make this inference. Therefore, OF's adjudication should be reduced to simple possession of a stolen motor vehicle. If the court has any questions, I'm happy to answer them. All right, counsel. Thank you very much. Reflect for the record that you were under. 10 minutes. Justice McBride will be recognized. I think you're on mute, Justice McBride. Okay. Sorry about that. I was. Okay. Ms. Olstek, there's no testimony. You've already indicated there's absolutely no testimony in this record regarding the when they apprehended the respondent. Is that right? Yes, that's correct. The state had every opportunity to put that evidence in the record. They could have asked Dorsch what the driver looked like. They could have asked Officer Serheja or Kushner what description they were given as part of their course of investigation, but they never elicited any testimony of that nature. But they did say they heard a description. They did, yeah. And the Officer Dorsch, if I'm saying it right, he gave a description during his testimony that the person had, when he saw him run past the car, he had on white or white-colored striped pants. Is that right? I have the exact quote here, if it helps. It was a little bit muddled. Like, it didn't really make quite a lot of sense. But what he said was white or light-colored striped dark pants. So, I mean, it's hard to understand if he meant the stripes were white or the stripes were dark and the pants were light. I'm not 100% sure. But even giving the officer all the benefit of the doubt in that description, there just were no stripes whatsoever on OF's pants. So. But he was apprehended? Yes. Okay. And this is more on the, did he ever describe the time he had to see his face during that turn? Remember at the very beginning, he said that he was turning right and the respondent was in a car turning left. Yes. I believe that the testimony seemed to indicate that the turn happened within seconds of him approaching the intersection because he never came to a complete stop and the car was turned in front of him as he was slowing down at the intersection. So, I don't recall if there was a specific time, but I think we can definitely infer that it was a few seconds of. And was there, when he testified that he saw, he did testify he saw him two times later, right? This was, he never saw him get out of the car. I never saw him in the car after that turn. He did see him two times later, didn't he? Yes. But did he say he saw his face at that time? Did he say he saw a profile? Did he say anything other than that now he had a, there was no longer a hoodie or, and that he was wearing these pants that were either light or white colored stripes? Did he ever say what part of his body or whatever he saw? He did say that he saw, he recognized him as the driver because he saw his face, but he didn't give us any information about his face. I mean, there was absolutely no indication about the age of this person, the height, weight, skin color. I mean, we got absolutely no information, even though Dorsch is claiming to recall this person's face very clearly. All right. And then I just want to ask about the lights. You agree the statute requires that the lights be red and blue, oscillating. Is that right? Yeah. Red or blue. Red or blue. And they have to be oscillating. They can be illuminated. I mean, the statute says illuminated. They have to be, they have to be either red or blue. And there was no testimony in the record at any time about the color. No. Was there any testimony, it seems that the record sort of suggests, and I know it doesn't matter whether the respondent was able to know someone was following him, but was there any testimony that the officer was ever directly behind this car when he was involved in this limited, I don't want to call it a chase, but when he was, after he had, you know, had his lights and siren on, was there any evidence about how close he was to the car? I don't know that we know exactly how close he was to the car when he did turn his lights on, but Dorsch did testify that there were several times that the jeep made turns and he was fairly significantly behind the car. And there was, you know, other cars between them. And he even lost sight, I believe, of the car sometimes as it turned. So we do know that he wasn't driving directly behind this jeep at all times, but he was following it. And I think from that, we can, I mean, it's really hard to infer that somebody would know police was, a police officer was following them in this unmarked vehicle that sort of appears to be following, but not actually pulling them over for, you know, an eighth of a mile. All right, I don't have any other questions. All right, thank you. Justice House, any questions? Yes, with regard to the identification, you know, we often get cases where we say if we had sat for trial, we probably may have gone a different direction. But here we have a standard of review that we are to indulge the findings of fact by the trial court. And, you know, what cases do you have which state that a misidentification of article of clothing is sufficient to reverse? I don't have any cases on hand that specifically say that. I mean, in fact, I think we all know that there are not a lot of cases that reverse on identification. I mean, I will, that's true. But here, I don't think we just have one piece of clothing. We have really poor visibility conditions, a very, very short period of time to view the offender in these poor visibility conditions. We have an officer admitting that he had no reason and was not paying attention to this at all, yet claiming to get a very good look at someone's face enough to identify them in a show up. I agree that, like, maybe the pants alone might not be enough. But here, I think we have numerous things that compound to, that impact Dorsch's reliability. Well, we have to be totally dissatisfied with the finding here. We have a 20-something year old officer who says he saw him lock eyes before the turn and observed the vehicle turn right in front of him where he got a side view. And although it was raining, it was the daylight, am I correct? Yes. Okay. And he followed him for some distance behind in the alley. Is that right? That's correct. Okay. Now, how do we take that? How would you write that when we say we're totally dissatisfied with the identification here? How would you write that? To begin with, I just want to start with your characterization of locking eyes. That is definitely not in the record. I believe the state put that in their brief. But the record shows that it was actually the state's attorney who asked Officer Dorsch, did you make eye contact? Now, eye contact is then used several times throughout the record, appearingly as a colloquialism. And the state's attorney asked Dorsch if he made eye contact with the jeep several times. He asked then if he made eye contact with the person running away from his car. You can't make eye contact with somebody who can't, you know, an inanimate object. You can't make eye contact with somebody who's not looking at you like the person who was running away from him. So I don't know how much weight to even put on the fact that Dorsch agreed he made eye contact because he did not say he locked eyes. Those were absolutely not his own words. They were the state's attorney's words. It seems like it was used very similarly in this record to show that he saw something, not that he made eye contact with a person. But even if he did make eye contact, like driving in the rain with water on the panes of glass, if it's raining out, there will be drops of water on the windows of a car. Given the drops of water on the car, it seems unlikely that you would get such a good view of somebody from across an intersection that you would be confident to identify their face later. And here, we shouldn't be confident because Dorsch doesn't give us any reason to be. He doesn't provide us with a description of that driver's face. He doesn't even tell us whether it was a man or a woman, whether they were young or old, whether they had short hair or long hair. I mean, we don't have any description. So I think here we have to remember that it's all these factors coming together that impact his reliability. I don't have any more questions. Okay. Well, Ms. Sostek, I would agree with you that the prosecutor seemed to be using the phrase eye contact in ways you wouldn't normally expect. Certainly, there was some discussion about making eye contact with the car. But he, I believe the prosecutor was a female. She did ask Officer Dorsch on redirect, did you make eye contact? And however she, I'm sorry, did you make eye contact with the respondent? And however she may have been using the phrase eye contact, I assume that Officer Dorsch took it in the more typical way. And he did say he made eye contact. I agree there was not much detail, but he did make that point. He also saw the car as the car was turning left. Let me ask you a couple of questions. So he's, Officer Dorsch is following the car. And I think we would all agree that if you're behind a car, you're not seeing somebody from the front. That's obvious, but whatever he may have said in the record, could he have seen the person's hair? Could he have seen the person's profile as the driver turned to his right or left? I don't believe there's any testimony that would give credence to believing that he could have seen the driver's profile or face at any point when they were driving because they did admit there were several times that he was actually like several car lengths behind this Jeep. And that when it turned, he, I believe, said that he had lost sight once or twice as well. So he wasn't so close that when the car turned, he would have gotten a profile view. And in fact, if that was true, you know, that was evidence for the state to put into the record. And there just isn't evidence of that. You're not fair. Yeah, he certainly didn't say any of that. I agree. And he was initially just sort of casually following him in the way that you just happened to be behind another car. It wasn't until the car sped up and he got some distance. Let me pin down something about this point in time when somebody runs across his car and who he says was responding. I was trying to follow along in the direct testimony. He had lost sight of the car at that point. And I think at that point, he'd even been told to stop chasing. So he was driving some place in that area and I think had come to a stop when he says the respondent ran across his view. First of all, do I have that all correct? Yeah, I believe that's pretty close. I don't know if he was at a stop or not. But yeah, that seems accurate. He did turn off this. He stopped pursuing and then he did not continue to follow the jeep after it made a turn. And I believe that's where he lost it. Okay. Do we have any evidence in the record of where the respondent was, if it was the respondent, when he was running across the view of the officer versus where the car was found? We have no idea where the car was found. Absolutely none. There's no evidence in the record. We do know the car was found because the owner testified that the vehicle was returned to her. But we have no idea where that car was left. And it does seem a little mysterious that the state didn't tell us where the car was left. If truly the driver got out and then was running within a few blocks of the car, it surely would have been found very close by, but we don't know that. Okay. I mean, that's another inference that doesn't help the state because they did not put evidence of where the car was found in the record. It would have, I mean, the car can't really support an inference that OF was the driver when we don't know if that person running was in fact near the car at all. Okay. Well, I think I've completed my questions. Do either of my colleagues have any follow-up questions before we turn to the FLE? No, I don't. Okay. Well, thank you, Ms. Shostak. We'll be hearing from you. I'm sorry, I mispronounced your name, Shostak. We will be returning to you shortly, Mr. Erb. We can give you up to 10 minutes or a little bit more. Thank you, your honor. May I begin? Of course. Okay. Good afternoon, counsel, your honors. My name again is Assistant State's Attorney Justin Erb, and I represent the people of the state of Illinois. May it please the court. Before I begin with the substantive part of my arguments, I want to bring this court's attention to the people citation to the case, People v. Califf, that's C-A-L-A-F-F, on page 14 of our brief. This case was cited in error. It is an unpublished opinion under Supreme Court Rule 23. Therefore, it should play no role in this court's decision, and I apologize for the oversight. Beginning with the substance of our argument, our respondent's trial, Officer Brian Dorsch, a Chicago police officer of 22 years, testified that on December 27, 2018, he saw a respondent driving a Jeep Patriot that he later learned was stolen. The trial court, acting as the finder of fact, believed Officer Dorsch's testimony. The only question under this issue is whether no reasonable trier of fact could have come to the same conclusion as that trial court, taking all evidence in the light most favorable to the people. Given the facts on the record, this was an eminently reasonable conclusion for the court to make, and this court should affirm it. The evidence at trial showed that while he was driving in an area where he was investigating a burglary, Officer Dorsch made uninterrupted eye contact with respondent as he made a right-hand turn into an intersection. They were driving towards each other and ended up only 10 to 15 feet apart. This happened during the daytime, around 11 a.m. There was nothing other than a drizzle that separated the two. Furthermore, although nothing about the Jeep itself caught Officer Dorsch's attention, the driver of the Jeep obviously caught at least enough of his attention that he was able to remember that he made eye contact with respondent. Furthermore, after respondent was out of the Jeep, Officer Dorsch was able to view him a second time and was able to give a description of him, and as a result of that description, other officers who had never seen respondent were able to arrest him. Officer Dorsch was unequivocal, confident, and consistent, both during his identification of the respondent at the arrest scene, which occurred at most a few hours after his initial identification, and during his testimony at trial. The trial, in fact, was also able to consider additional secondary evidence of respondent's guilt by providing testimony about his conduct when he was outside the car, such as when he immediately fled on foot from Officer Dorsch and then later from Officer Cerjea. As respondent points out on appeal, Officer Dorsch did describe respondent's pants as having a stripe on them, but when respondent was later arrested, he was wearing solid colored pants. Furthermore, it is true that respondent was arrested near his home. However, none of these are newly discovered facts. These are facts and arguments that were presented to the trial court who had the benefit of observing Officer Dorsch's testimony in person and made the determination that he believed what he was saying. The mere presence of conflicting facts is far from sufficient to support a reversal on appeal because it is the trial court's duty to consider the extent to which these facts conflicted and resolve those conflictions. The people were not required to prove their case beyond any shadow of a doubt, and the trial fact was not obliged to believe every hypothesis that results in respondent's innocence. Furthermore, respondents cited, for the first time on appeal, a few scientific studies that cast a doubt on one of the biggest factors, the level of certainty. This is just highlighting the attempt to turn this appeal into a retrial. This is an instance of this court, I apologize, of respondent inviting this court to replace its discretion with the trial court's and even nudges it along the way by presenting new evidence that the trial court did not get. This is not the venue to consider these studies, and although the people would be happy to supplement our brief with studies confirming the significance of a witness's level of certainty and the accuracy of their identification, this is simply not the time for either party to present them. The applicable standard is whether any reasonable finder of fact could have concluded that respondent was the driver. For all the case law and biggest factors, the core of this issue is whether that was a reasonable determination and whether officer's authority should be believed. It was a reasonable determination. It was supported by the record, and this court should draw all reasonable inferences to the petitioner's favor at this stage. Therefore, the court should uphold the trial court's adjudication. Moving on to issue two. As this court is also well aware, finders of facts are within their rights to make reasonable inferences based on the facts on the record and can use those inferences to find that an element of a crime existed. Officer finders of facts are encouraged to use their common sense and experience in making these factual findings. Here, the question is whether Officer Dorse activated his red or blue oscillating police lights when he tried to pull respondent over. As a matter of well-known common experience, police lights on top of Chicago police cars are flashing and are red or blue colored. Therefore, the question is whether when Officer Dorse testified that he turned on his lights, it was reasonable to infer that he was talking about his emergency police lights. Here are the facts. Officer Dorse only turned on his lights when he realized that the car was stolen. He said he turned on his lights because he wanted respondent to pull over. When Officer Dorse turned on his lights, that caused his sirens to activate. When Officer Dorse turned on his lights, respondent sped away from him. After a while, Officer Dorse's supervisor instructed him to stop pursuing respondent, and he responded by turning off his lights. He described the difference between following respondent and pursuing respondent as having his lights and siren on. There's only one reasonable inference that can be made here. When Officer Dorse talked about his lights, he was not referring to his headlights, nor his interior dome light, nor was he talking about his flashlight. Within the context of the testimony, there's only one reasonable inference that the lights he was talking about were his emergency lights, which are red and blue, because they are police Chicago lights, and he was driving a unmarked Chicago police car. This court has already held in People v. Brown that when an officer refers to his emergency lights, it's reasonable to assume they are talking about their red and blue police lights. There is no reason for this court to overturn this decision where it stands for the simple, fundamental, bedrock principle that a finder of fact may make reasonable inferences when it finds a party guilty. Because the trial court's inference that the lights were red or blue is reasonable in these circumstances, this court should affirm respondent's adjudication for aggravated possession of a motor vehicle. All right. Thank you, Mr. Erb. I had myself on mute. I apologize. We would turn to Justice McBride now. I guess I should state that we've momentarily lost Justice McBride. Is your video turned off, Justice McBride? Okay. I might ask our clerk, Darren, have you lost Justice McBride? Hi, Judge. Hi. Have we lost Justice McBride? Yes. Hold on for one minute, Justice. Okay. Yeah. You want me to call her? If we could try to bring her back on, I'm sure it's not intentional. Okay. I'll send her another invitation. Okay. We'll just stand in for a moment. Bear with me for a second. Perfect. Okay. I just sent her a new invitation, Justice. All right. She has indicated to me that she lost connection. She thought maybe we all did. So she's, I'm sure, going to make an attempt to get back on. Okay. I appreciate your patience, counsel.  Okay. Well, why don't we do this? Obviously, the whole oral argument will be heard. So if Justice McBride is unable to join us, we'll have to continue, obviously, without her. And she can listen to the remainder. And if she does join us later, she could obviously listen to whatever Justice House asks of you, Mr. Earp, later as well. So I think what we're going to do is just turn to Justice House now and see if Justice House has any questions. Going to the second issue, this issue of the lights. The statement was that he turned on his, the officer turned on his lights. He didn't say they were emergency lights. Is there a difference there? Is there enough there to satisfy the statutory requirements? Your Honor, the people's position is that this is not setting aside the statutory requirements. The people's position here is that it is an element that the people had to prove that the lights were red or blue. However, as a well-settled piece of case law under People View Wheeler, the trier effect is entitled to make reasonable inferences when she is making her determination about whether the respondent was proven guilty. Here, the inference the court made was that the colors of the lights were red and blue. The transcript and the record is very clear that every time Officer Dorsch was talking about his lights, it was always with the intention of pulling respondent over. It would make, the only way that his testimony would make the slightest shred of sense is in the context that he was talking about his police lights. Therefore, because just as a matter of common knowledge and human experience, police lights are red or blue, the court was able to put two and two together there and decide that he was talking about his police lights. And although he could have testified that the exact color of them, it was unnecessary given that it was such an easy and reasonable inference to make about what he was talking about. Did the trial court specifically make a finding that the lights were red or blue in its decision? Your Honor, the trial court found respondent guilty of all counts and then merged them into one. So in order to find respondent guilty of fleeing and eluding, it would have had to found that the lights were red or blue. So although the court did not expressly say that I'm making an inference, I don't believe it was required to. All right, I don't have any other questions. Okay, thank you. I am just, for the record, I am trying to keep in touch with Justice McBride, at least by text message to see if she's going to be rejoining. But we'll continue, I guess, with my questions. Mr. Erb, from the time that Officer Dorsch first saw the respondent traveling, or at least facing the opposite direction as he, so they were face to face, so to speak, about 10 to 15 feet apart. That was his testimony. He made eye contact with the respondent before the respondent made the left turn. Between that moment in time and the time that he saw a man running across his car, um, on foot, between those two periods of time, is there any evidence in the record that Officer Dorsch saw the face of the suspect? Between those two moments after the initial visual contact with the respondent, no, Your Honor. Okay, and is there any description by Mr. Dorsch in the record of anything about the respondent while he was in the Jeep driving? The, the record, as I understand it, is, said that he followed the respondent and then lost, followed him, then pursued him by turning on his lights and siren. And then after being told to stop pursuing him, he turned it off, lost contact with the vehicle, and then saw a respondent running across. And then at that point, he gave a description. So in terms of, if I'm understanding the question correctly, which is, did he give a description of respondent just using the information from the initial eye contact? No, he did not. Okay, so I think we have Justice McBride. So, Mr. Erb, so I'm correct that there's no evidence in the record that the person who was driving that Jeep, Patriot, had a hoodie on. Your Honor, I don't believe there's anything there, no. Okay. Well, Your Honor, to back... I'm sorry, go ahead. My apologies. Back up there, he said that after, he said after he got out of, out of the car, he saw that he was wearing a, a sweatshirt. But he, he didn't, although he didn't testify he was wearing anything different than when he initially saw him in the car, he didn't say what he was wearing in the car. Although the people would argue it's, it's reasonable to infer from there that he didn't change his clothes from being in the car to out of the car, given that he didn't specify otherwise. So it's reasonable to infer that from the time he was in the car until the time he was seen by Officer Dorsch running, he didn't change. But it's also reasonable to infer that between the time he crossed the view of the officer until he was detained, he did change. That's what you're saying? Your Honor, there, there would be two aspects to this. First, the Officer, Officer Dorsch testified that he was initially wearing one color sweatshirt and ran into an alley where he lost eye contact. Officer Dorsch cut him off and he was wearing a different sweatshirt. The second description adds to his pants. There was some discussion of that during the previous round of questioning. It is the people's interpretation of his testimony that when he said it was light colored stripes, he was referring to the, the stripes and not the, the actual pants themselves. So your, your position would be that he was wearing the same pants when he was detained that he was wearing when he was seen running across the front of the car of Officer Dorsch? Um, Your Honor, the people, I suppose, don't have a position beyond that. It was a reasonable identification and that the conviction should be supported as to that. Okay. And Your Honor, if I, if I may add to that, um, again, this, this is another example of the trier of fact was bound to consider and try to resolve and coming up with a verdict and they did, uh, or the trial court did, uh, Your Honor, that that's their discussion. And also the fact that we are asking questions about, um, you know, we're reading the record and we're saying it's not clear the, the trier of fact made a conviction. They, the reason that they have such weight at this level is because they were there. They're able to hear inflections of tone and conversation that we are not privy to at this stage. So that this is exactly why, uh, when we're trying to interpret the record by, you know, examining it under a microscope like this, this is why we give discretion to the trial court because they were there and they should, their, uh, determination as to what facts happened, uh, should be respected at this stage. Um, I understand that. And I would be saying the same thing if I were you. Um, and I don't disagree in a general sense, but I would also say that all the way up to the U S Supreme court and certainly the Illinois Supreme court, when we're talking about single identification cases, we are required as a reviewing court to go through the factors, the vigorous factors. Um, and we have to be satisfied that on balance drawing all reasonable inferences that there is sufficient evidence of this identification. Um, you pointed out that the, the, the state appellate defender was citing studies about the, the lack of correlation between confidence in your identification and, uh, and, and it actually being accurate, that confidence and accuracy do not go hand in hand. And you're correct that this is probably not the forum to start reading studies, but people versus Lerma has said that too. Haven't they? Our Supreme court just a few years ago, note the fact that the confidence and, um, accuracy do not go hand in hand. And in fact, by some accounts, they actually tend to diverge from one another. Again, you're not going through the biggest factors. I suppose I'll, I'll first address the biggest factors. Then I will address the issue. But am I correct that Lerma said that, that our Supreme court said that a few years ago? To my, to my knowledge, yes, the Supreme court did acknowledge those studies. But again, if it's the, the, if this court would like further evidence about whether it can, uh, consider or whether it should consider officer Dorsey's, uh, confident unequivocal testimony, the people would be happy to supplement our brief, but further studies disputing that. Okay. Well, let me, let me focus on at least one of them here. Um, I don't have the biggest factors in front of me, forgive me, but I know that there's one that talks about the previous description of the suspect versus, um, you know, how, how the previous description of the suspect matches, you know, the subsequent one. Am I correct that we have no previous description here from officer Dorsey? He, he says he saw his face. He says he made eye contact with him when they were facing each other at the intersection as it were. Um, but he doesn't say anything about that eye contact. He doesn't say anything about what he saw. He didn't say, I saw an African American, roughly 16 years old with this kind of hair. He didn't say I saw a white woman. He didn't say anything. Nor did any of the police officers testify as to anything that officer Dorsey told them. Is there any evidence in the record of his initial description? Um, your honor, beyond the, the, the description itself is not in the record. However, the, the people's position here is the fact that he gave a description and then based on that description, uh, they pulled over a respondent and then just a few hours later with length of time being, uh, another one of the biggest factors between the initial viewing and the later identification officer Dorsch, uh, confidently got out of his car. He said, that's him or something to that effect. Uh, I have not viewed the video since August, but he confidently got out of the car and said, that is the person. So based on that, your honor, I would, I would say, although the, the accuracy of description of the description is not a factor in our favor as the people conceded in our brief, it's, it's reasonable there, or there's no reason to overturn the, the, the conviction just based on that alone, especially where, uh, this quarter or the appellate court has held that a mere discrepancy between a piece of clothing is not sufficient to overturn a conviction. Okay. Um, but the description that the other officers responded to that led to the detention of the defendant, the defendant, the defendant, the defendant, the defendant was the description of him while he was running across the sideline of, of officer Dorsch's car, right? They weren't responding to a description made of a guy in a car. They were responding to when he called in, Hey, he's running across the car right now. And this is what he's wearing, right? Uh, yes, your honor. Okay. So, so is there any connection in the record between where he was seen running across the car of, uh, of officer Dorsch, you know, with the hoodie and the light stripes, dark pants and where the car was found? Uh, your honor in the record, that's where that's at the, the exact street where officer Dorsch lost contact with the vehicle. So it would be right where he was chasing us right on hot pursuit. And although it is true that it was where he lived, there's no, that, that is again, another conflicting fact that the trial court considered and heard and came to a different determination. Uh, justice McBride, uh, I'm glad you could get back on, um, any questions for the state? Yeah, I apologize. I I'm on a different, uh, computer now. Something happened with that other one, but I have a couple of questions. The description that the officer actually testified to Dorsch was, uh, a sweatshirt and these pants, right? The pants that were either light or white colored striped pants, correct? Um, your honor, the, the person in his car had the, apparently this kind of a clothing description. Is that right? The people are my, my recollection of, of the record is that he was describing what he was wearing. I, I I'll rely, I'll rely on my brief as to whether or not that was the description that actually went out. Okay. Well, that's the thing. We don't know what the description was that went out, but the only description that the officer ever gave was the one I just described. Obviously he couldn't see striped pants or even a sweatshirt. I mean, I doubt it when he's making a left, uh, left-hand turn. So he says that this person, when he ran by his car, he gives a description. I don't see how he could have given any other description out beside that one, but maybe I'm wrong. There is no other description. The officers never ever, they said they had a description and that that's what they based their apprehension of him on, that that's in the record, but they never described that description. So what I'm saying to you is, is that if they had this description of a person with a sweatshirt and then the pants, uh, how do you reconcile the fact that when he's in, when he's actually arrested, he doesn't have anything resembling that on? And the officers, I just, the record seems to suggest that they were working off of this description, but when they apprehend him, he doesn't have any pants on that are striped. Yeah, there's, there's a few ways I would respond to that. First, um, again, as, as this court has held before a discrepancy in an article of clothing is not sufficient on appeal to, uh, reverse a, a conviction. This is a totality of the circumstances test and there, and, and then all the other people have conceded that the accuracy of his prior descriptions does not favor the people. There was still the opportunity to view. There was, uh, officer Dorsey's degree of attention. There was his level of certainty and there was his length of time. Furthermore, uh, we, there's circumstantial evidence that as, uh, officer, uh, came across respondent, she did not immediately go to arrest him. She rolled down the window and tried to talk to him and he ran off. Uh, your honor, I believe from all these things, that's a reasonable conclusion, despite, uh, whether or not he was wearing striped pants to still come to the conclusion that he made a correct identification. But this is a case where he's not caught in a car. He's not seen by anyone else at any time afterward in a car he's arrested. Uh, we don't know where he's arrested in terms of where that car is, but this is not a situation where the person is, is closely, you know, or he's found near the car or anywhere, you know, close to the car he's apprehended near where he lives. And the description, the only description that we have is one that doesn't match at all. And I'm not, I'm not, I'm not saying that that's a, you know, deciding factor one way or the other, but you have a very limited view from the very beginning with the officer seeing someone making a turn in front of him. You said there was a couple of hours between the time that the officer saw him and the arrest. Is that right? Um, your honor, we don't have the amount, the exact amount of time between the initial, uh, identification and then the later, um, identification. However, the length of time is a factor that, uh, helps the people in this case, or there's court has held, uh, upheld identifications where it's been weeks since the initial viewing. This one is a few hours. It's within the same day. Uh, the people's estimation is based on, on the video. It's still daytime and the initial, um, arrest was around noon. So from there, it would be a quick identification. So it was, I didn't know where you were heading with several hours. I didn't think it was a long time. And I know the record shows it was the same day. Has there been any questions about the red or blue light? I apologize. I missed some of the, in, in your, I think justice has some questions. Justice McBride, but please go right ahead. But was there any, there was no testimony that the color of the lights was either red or blue. That right? There was no direct testimony about the colors of the lights. All right. And do you think that that's something that we should reasonably infer or looking at it? I'm sorry. Should the trial court have reasonably inferred this mandatory requirement of red or blue when there was no testimony that the, that that's what makes this aggravated, right? Yes, ma'am. Um, the, the, the people's position is that this can be relied on because it's a reasonable inference based on the record as to what the colors were. If it was an element of the crime, for example, to prove that of a crime to prove that a police officer was, is wearing a blue shirt, for example. And then, um, late at the testimony, they asked, were you wearing your standard police uniform? And he said, yes, I was wearing my standard police uniform. Um, it would be a reasonable inference for the trier of fact to say, well, I've lived in the world. I'm a person who lives in Chicago. I know what police uniforms look like. So if from that, those two connections, you can put it together and infer an element of the case, which is again, a bedrock foundational principle in reasonable doubt cases that inferences can be made to find an element of the crime, even if they weren't directly testified to. Sure. They have to be reasonable though. Wasn't this an unmarked squad car? This was an unmarked squad car. Yes. Because you said earlier in your comments that, uh, everybody knows that, you know, police cars have red and white or red and blue lights, but this was not your standard Chicago PD car. It's an unmarked car. I mean, where, where would you infer from that, that all the unmarked cars have red and blue red or blue, uh, oscillating lights? Well, your honor, um, to, to begin, uh, the, the people would push back that because the car is unmarked doesn't mean it's not a police car. It's a, this wasn't his personal car or, or something that we're arguing that he himself where you can infer that by himself, he went and took a siren and the light out of another police car and put it in a different car. This is a Chicago police car. Just given the context of his testimony, um, it would be very difficult, if not impossible to infer that he wasn't talking about police lights and marked or unmarked, uh, Chicago police cars when, when they turned their lights on it, they are red or blue. They're not, uh, it would make a little sense for them to be green or purple, for example. So these are just common observations that Chicagoans and at Trier's back know and can be relied upon. And that combined with the context of what officer Dorse was trying to achieve by turning on the lights, you can infer their color. Well, I, I have to disagree with you. Um, I think if you look closely at the record, he was asked, were you in a marked or an unmarked car? I believe that he said unmarked. Um, so I, and, and I don't, I don't think you're going to find a case that you've even described that would suggest that unmarked police cars are commonly equipped with sirens, oscillating lights, and that they're red or blue. Some of them are yellow, some are amber, uh, whatever. So I, I just, I don't know there's this reasonable inference when the, the record is completely absent of any description of the lights other than I put on my lights. So, but I have no other questions. All right. Um, Justice House, did you have any follow-up? No, I don't. Okay. Um, I just have one, uh, I would ask it of either party. I just want to lock down. And by the way, we're getting a little tight on time, but I just want to lock down this length of time thing, um, because I, I got a little confused myself. Am I hearing correctly that between the time the officer Dorsch stopped giving chase and the time that it responded or somebody ran across the car, that could be a matter of a couple of hours. Is that what I heard? Allow me to, to clarify, Your Honor. That was not what I was. I was referring to the time, um, officer Dorsch saw, uh, responded the second time or testified that he saw him the second time running across. And then later when he was arrested by officer Kushner and the officer Rumitowski, uh, that length of time was at most a couple of hours. Okay. All right. Okay. Thank you very much. Um, Ms. Sostok, could I, could I hold you to three minutes of, uh, uninterrupted rebuttal? Sure. Um, first I'd like to point out that, um, contrary to the state, um, the state tries to put a great amount of emphasis on the fact that Dorsch made eye contact with the driver of the Jeep. And while I agree that that is the testimony, um, the fact is that courts look at all the biggest factors in evaluating reliability and purely just making eye contact with somebody and then claiming that you remembered their face later is just not sufficient evidence to, to prove that this was actually the person committing this offense. Um, additionally, um, I would, I would just point out that for example, like as I stand here, I can see your honors on my computer screen and you're only about two feet away from me, but some of the images are slightly blurry and that would be, um, while I can see your face and make eye contact with you, I would not necessarily be able to confidently identify you in an hour's time as the person that I made eye contact with. So just purely making eye contact doesn't mean that somebody can, um, intake all the possible, like all the necessary attributes of someone's face and that they could do so in the rain in a matter of seconds while you're driving your own car and about to turn in opposite direction and not pursuing this vehicle for any crime whatsoever. Um, I just point out that the, the cases the state cited in its brief where they tried to compare this case, um, each of those, um, involved offenders where, um, the witnesses knew that they were about to commit a crime and they were face to face with this, um, criminal active person committing a criminal activity. And all of those cases also had two eyewitness identifications. Um, so I think the important thing to remember here is that we need to look at all the factors and most of these factors weigh against the state. Um, significantly the accuracy of prior descriptions. The only prior description we have was inaccurate. We have absolutely no description of the person who committed this crime and was driving the claiming that this was the same person. So, um, I don't, none of the officers gave a description and officer Dorsch, while he continues to say he recognized this person's face, he, he neglects to tell us anything more about this person other than their striped pants. And that's just not enough given the conditions that he viewed the driver of this stolen jeep. Um, and with regards to the second issue on the red or blue lights, um, justice McBride actually made most of the points that I was planning to make. Um, I will just note that the, the statute, um, specifically says that the requirement of red or blue lights shall not preclude the use of Amber or white oscillating, rotating or flashing lights. The fact that the legislature put in wording about Amber or white oscillating lights implies that all police vehicles are not equipped with red or blue lights. There is a reason they made a distinction between red or blue lights and Amber and white lights. And I don't believe that there's anything in the record or the case law that could, um, lead us to infer that all unmarked Chicago police vehicles have red or blue lights. That is far beyond the facts that are presented in this case. Um, additionally, um, just as far as, um, the state was appealing to our common sense about what types of lights police cars have, I would say common sense tells us that on March cars could have different types of lights. Um, they don't always have them attached in the same place. Um, I know that sometimes they could be like in the front of the SUV or they could be attached on, you know, under behind the rear view mirror or something, but we don't know what types of lights on marked police cars are equipped with. So the fact that he only testified to lights is just not enough. Um, can you wrap up council? Yes. Um, I just want to say one thing on the, um, the state's comment about citing studies. I will mention that in my brief, I cited Lerma right next to the study. I cite, um, in conjunction with the study sites, there are case sites to support that. And, um, the state has offered to provide additional citations, but they had every opportunity to do that in their brief. Um, I made those citations in my opening brief and the state could have rebutted that in their response, but they chose not to. Um, so I would just ask that, um, OS conviction be reversed or alternatively reduced to simple possession. Thank you. All right. Do we have any questions from you, Justice McBride? No questions, but I would indicate Mr. Irv. I apologize for missing part of the comments and I will, uh, listen to the full audio. It will be on the Supreme Court website tomorrow. So thank you. Justice House. Do you have any questions? No, I don't have any other questions. Thank you. All right. Well, then I think both of you counsel for a very fine job in your briefs, a very fine job today and for bearing with us through some technical difficulties. Um, we will take the matter under advisement and for now we will stand adjourned. Thank you very much.